BH

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION



U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

MAR 2 9 2012

CLERK, U.S. DISTRICT COURT
By _____
Deputy

| | |
|---|---|
| S & H INDUSTRIES, INC., | § |
| | § |
| Plaintiff, | § |
| | § |
| V. | § |
| | § |
| KARL SELANDER, individually and | § |
| d/b/a ATCOA, INC. a/k/a AIR TOOL | § |
| CORP. OF AMERICA; DONALD H. | § |
| LOKKE, individually and d/b/a LOKKE | § |
| ADVERTISING and ATCOA, INC. a/k/a | § |
| AIR TOOL CORP. OF AMERICA; | § |
| NETPRPRO, INC.; and ATCOA, INC. | § |
| a/k/a AIR TOOL CORP. OF AMERICA, | § |
| | § |
| Defendants. | § |
| | § |

CIVIL ACTION NO. 3:11-CV-2988-M (BH)

ORIGINAL

Amendment to Defendant's to Plaintiff's Complaint

To: Judge Irma Carrillo Ramirez
United States Magistrate Judge

Your Honor:

In our search of available legal assistance, case history and legal
opinions, available from the Internet, we have come to realize that
we own common law copyrights to all of what is written on the
Original, authorized for production, Blueprint, the document we
possess and own. It is initialed by Roy Brodsky, Pres., Otto
Hendrickson, Inventor, Karl Selander, Vice Pres. Production and
Development and the Chromalloy Drawing Engineer. This is the
final document authorizing the first production of the ATCOA
Viking Straightline Air Sander.

After all of these years, being given inaccurate counsel and reading about patents, trademarks and copyrights, we somehow missed this new discovery about blueprint documents. What we have found, clearly declares that we have a copyright on any and all of the promotional materials for marketing the ATCOA Viking Sander using, our authored, extracted name, words and phrase regarding the name, "Viking" and "Dual Filer/Sander" description of the functions intended to be attached to the Viking Sander. Ironically, as intended on the blueprint, this name and function was NEVER attached or printed on the ATCOA Viking Sanders, "Ever"! This phrase was only used in the promotional materials, national ads, brochures, catalog sheets and trade show decorations for the purpose of marketing this tool. Hence, according to these articles, we DO have copyrights to all of those promotional materials from the beginning of use by Air Tool Corp. of America, (ATCOA) who were never given written permission to use for such purposes including all of the subsequent infringers.

Reviewing all of our defenses, which includes our continuous use without objection for over 28 years, addressing the flawed "First Use in Commerce" dates, ALL being incorrect. Further, our proofs of the name Viking becoming generic within the first 15 years of existence, due to the infringement, by Rodac, of the Hendrickson Patent and the ATCOA license provided by Otto Hendrickson, in 1962, this discovery supersedes all of the above.

We would like to "Cut to the Chase" by entering the enclosed materials from authoritative legal sources. From the beginning, we claimed to hold a copyright to the aesthetic design of the ATCOA Viking Straightline Sander and authorship of the Company name, Air Tool Corp. of America and Logo. Additionally, we announced we own a copyright to the name, term/phrase, "Viking Dual Filer/Sander. Mistakenly, we were advised, by counsel, that we did not have a copyright as the Original Blueprint was covered in the

patent and further the trademark, now claimed by S&H Industries. Not being educated in these legal terms and concepts, we took the word of Counsel as final. With persistence in our search, we found these two articles based on published facts, legal opinions and court decisions. Finding that Blueprints do have standing as copyrightable contents, we are sure that we are entitled to the common law copyrights for some of those portions.

Again, we request dismissal of this lawsuit as it is without merit. The S&H Industries, Inc. failed, from the start, with their purchase of Viking Industries, LLP in 2006 to research the details and history of the transfers of the "Trademark" registration obtained by fraud. Now, with proof of our rightful common law copyrights with items covered in the original official blueprint, this action should be dismissed immediately allowing damages caused by the S&H attack against Don Lokke, netPRpro, Inc., our nephew and SEO, our legal expenses and infringement of our copyrights.

From the beginning of Air Tool Corp. of America, ATCOA, we were one of the three Founders and now the only living survivor. Never were we an employee of ATCOA nor paid wages. Being the only one of the three Founders with prior knowledge of the working of this tool and acting as an agent for Otto Hendrickson, Inventor, I was appointed Vice President of Production and Development. Our role in the production of the original blueprint document was that of co-authoring the company name, logo and we singularly created the name for the sander, "Viking Dual Filer/Sander", a title and description never physically applied to the sander itself throughout the life of the Company, Air Tool Corp. of America . Today, we own the common law copyright ATCOA original Logo and name, "Air Tool Corp. of America, the name Viking Dual, all written on the original blueprint. As mentioned before, we were never employed by the Company or receive any wages of any sort for our work with any and all of the projects

undertaken. Never was there a written permission, by Karl Selander, for use of his common law copyright. From the start, ATCOA used the name, term/phrase authored by Karl Selander and no subsequent user given written permission for use.

In addition to the blueprint, we also authored the ATCOA Service Manual Viking Dual Air Tool, created in 1963 and which we own a common law copyright. It was our sole creation and ATCOA was never given our written permission to use or publish this copyrighted material. ATCOA was never given written permission to use or publish the Term/Phrase: Viking Dual Filer/Sander was used from it's beginning with Company ads, Company published catalog pages, brochures and other promotional materials.

Our Sources are the following;
http://www.rochesterpatents.com/CopufightEDPD.htm
Blueprints enjoy copyright protection
II. Engineering Design Plans for Non-Building Subject Matter
III. Implication of Ownership of the Copyright
&
http://fairuse.stanford.edu/commentary_and_analysis/2003_09_stim.html
Second paragraph
Third paragraph, #3
The three categories of phrases, 'appropriated to sell product!
"Show Me the Money"
"The Best Offense is a Good Defense" para. #3b.
Conclusion, paragraph #2 - 29

Notes on the Article, "Copyright of Engineering Drawings, Plans and Designs:

Introduction

a.  In these paragraphs 1,2 & 4, note the possibility of protection for copyright by method of expression, original works of authorship and reducing ideas into drawings and plans to give them concrete form.

b.  Further, copyright for work product misappropriated and additional revenue streams for professional endeavors.

Blueprints Enjoy Copyright Protection

a.  Express ideas in concrete form of blueprints eligible for copyright protection.

b.  Author of drawings is the sole owner of the copyright!

II. Engineering Design Plans for Non-Building Subject Matter

a.  Author/Engineer may have interest in copyright of his work as it has been widely reproduced in marketing materials, national ads, brochures and instructional manuals.

b.  "Useful Articles" may have copyrightable aspects.  "Useful Article" is an object having an intrinsic utilitarian function that is not merely to portray the appearance of the article or to convey information.

c.  Useful article may have copyrightable features. (See examples)

III. Implications of Ownership of the Copyright

a. With the absence of a written agreement to the contrary, the author IS the owner of the copyright in the plans.

b. Transfer of Copyright; No such document exists!

c. Modification of the Plans; All modifications on the Original blueprint are considered derivative works under copyright law and are protected by copyright.

d. All of the modifications belong to the original copyright owner.

IV. Creating and Registering a Copyright.

a. My work is under copyright protection the moment it is created and fixed in a tangible form that is perceptible.

(All of the above are included with the entitlements with a blueprints of "Non-Building" subject matter.)

# Copyright of Engineering Drawings, Plans and Designs

Home
Up

## Introduction

Copyright, a form of intellectual property law protects original works of authorship including literary, dramatic, musical, and artistic works. Artistic works include poetry, novels, movies, songs, and computer software. Architecture is visual art that enjoys copyright protection. Copyright does not protect facts, discoveries, ideas, systems, or methods of operation, although it may protect the way these things are expressed. Chapter 13 of the Copyright Law protects original designs of vessel hulls.

Other forms of intellectual property include patents and trademarks. Copyright protects original works of authorship, while a patent protects inventions or discoveries. A trademark protects words, phrases, symbols, or designs that identify the source of the goods or services of one party and distinguish them from those of others.

Architectural works became subject to copyright protection in 1990. The copyright law defines "architectural work" as "the design of a building embodied in any tangible medium of expression, including a building, architectural plans, or drawings." The protection extends to the overall form as well as the arrangement and composition of spaces and elements in design. Protection does not extend to individual standard features or design elements that are functionally required like doors and windows.

Engineers regularly design useful articles and buildings. They reduce ideas into drawings and plans to give them concrete form. An engineer's professional and creative work product may be protected by copyright. Copyright may offer remedies in the event work product is misappropriated and additional revenue streams for professional endeavors. Let's explore how copyright may be useful

Attorney Advertising
Copyright © 2006- 2012
Tracy Jong, Esq.

for engineers.

# I. Plans for Construction of Structures

*Jack and Jill's business finally took off and the financial struggles of the early years were behind them. They engaged an engineering firm to design a custom dream house, investing a significant amount of money into the custom design services. It was all worth it to have a "one of a kind" house.*

*Three years later, Jack was driving to work and saw a house that looked remarkably like their "one of a kind" dream home. He turned around to give it a better look. It was not just similar, it was an exact duplicate!*

*Jack contacted his long-time family attorney about the misappropriation of his design ideas. To his dismay, he learned that the engineering firm owned the copyright in the plans. In fact, the design was so successful; they had sold dozens of copies of the prints in the past year for construction in the area. There was nothing illegal about what they had done.*

*Jack and Jill felt violated. Their expectations about the professional relationship and the rights in the work product were very different from the practices of the engineering firm. They could hardly recommend this firm to friends and associates, somehow feeling that their activities were immoral, even if they did not rise to the level of illegal.*

*The engineering firm, of course, had different expectations. In fact, its practices were common in the industry. The significant investment of resources in custom design work can be recovered by these additional revenue streams. In a way, that keeps the hourly rates at an affordable level for independent clients. This misunderstanding is likely to have a negative impact on their business. While it is immeasurable to what extent and how many would-be clients don't make that call after hearing the story of Jack and Jill, it is possible that the former clients have a large circle of influence. Additionally, the firm is proud of the work it did and its reputation in the community. Despite doing nothing wrong, they are dismayed at the prospect of unhappy clients.*

The best way to avoid these situations is to understand the body of rights each respective party has in this situation and to account for these rights in the engagement letter and initial client meetings. This will avoid unfortunate misunderstandings like the one just described.

So, what is the law surrounding designs, plans and constructed structures?

## The design concept is not protected by copyright

The design ideas of the homeowner–client are not represented in a concrete form and cannot be copyrighted. Ideas are not protected, but their expression may be protected.

## Blueprints enjoy copyright protection

The author who expresses those ideas in a concrete form (in the form of blueprints) is eligible for copyright protection. The author of the drawings is the sole owner of the copyright even if the ideas were a joint conception by client and engineer.

## The plans for custom designs may be reused

Copyright is a property right in the same way we think of real property (houses and land) or personal property (cars, clothing, jewelry and animals).

A homeowner who engages an engineer (or architect) in a contract that did not provide for the transfer of copyright is granted a one-time non-exclusive license to use the plans to build one structure and only one structure. The copyright owner, the engineer or engineering firm, may license the plans without restriction to be built anywhere, including right next door. He may do this by non-exclusive or exclusive license according to the terms of the contract reached between the parties.

Limitations to the engineer's rights may arise from unfair competition laws and the contract between the parties. Both issues were brought out in a case by Donald Trump against his architect. Trump's former architect, Mr. Birnbaum, designed a "look – alike" building across from Trump Plaza on Third Avenue in New York City. Mr. Birnbaum attempted to create a "twin tower" effect with similar buildings across from one another at the doorway to Third Avenue. Unfortunately, his creative vision was not shared by The Donald. In this case, the Trump Plaza design was considered distinctive in the mixture of overall elements and therefore, the overall mixture enjoyed copyright protection (but not individual elements). The contract provided that the architect did own the plans but did not have the right to use them for any other buildings. The contract provision played a crucial role in the judicial outcome. It is not clear how the

case would have turned out without this contractual provision.

## The Structures constructed from the plans may be protected by copyright

An original design of a building embodied in any tangible medium of expression, including a building, architectural plans, or drawings, is subject to copyright protection as an architectural work. The work includes the overall form as well as the arrangement and composition of spaces and elements in the design but does not include individual standard features or design elements that are functionally required. The term building means structures that are habitable by humans and intended to be both permanent and stationary.  This includes houses, office buildings, churches, museums, gazebos, and garden pavilions.

Structures other than buildings cannot be registered.  These may include bridges, cloverleafs, dams, walkways, tents, recreational vehicles, mobile homes, and boats.

Standard configurations of spaces, and individual standard features, such as windows, doors, and other staple building components, as well as functional elements whose design or placement is dictated by utilitarian concerns also are ineligible for registration.

## Copies of the Plans for Estimating or Construction

The right to copy the plans is retained by the copyright owner. The purchaser of a set of plans has a one-time license, not ownership of the copyright.  The licensee may not take the plans to a local copy shop and make copies, even for legitimate purposes in the course of using them to build the structure. (With the introduction of software and digital media, the law may be moving toward an implied license under fair use copyright provisions to allow an implied license to make reasonably necessary copies to build a single structure.)

This is typically handled by the transfer of rights under a non-exclusive license in the form of a reproducible set of the engineering plans. These rights carry the right to make a specified number of copies, typically 10 sets.  Alternatively, they may convey the right to make the necessary copies to construct one building if the number of copies is specifically limited.  An extended license may be granted for additional duplications if they become necessary or desirable. Each of these transactions may be separate and chargeable!  You are in the realm of

business, not legal, decisions on issues such as how many copies to allow and what fees are to be negotiated for the first and any extended licenses.

It is advisable to require customer licensees to obtain and destroy all copies given to construction companies, estimators, suppliers or government agencies once they have completed the project. (Some government agencies may require a set to be retained.) This prevents misappropriation of copyright interests by others. The customer/licensee may be held liable for infringement in which they played a role, even unknowingly. Explaining this often provides an incentive for their participation in this endeavor. You may even consider asking for a certification that the copies have been accounted for and destroyed.

## II. Engineering Design Plans for Non-BUILDING Subject Matter

Many of the same principles outlined above apply in the context of design plans for mechanical devices, electronic components and other subject matter. There is one critical difference, however, in that patent protection may be available for the design concept. In that case, the engineer will likely be deemed to be "one who is reducing the inventive concept to practice" and will have no ownership interest in the concept itself. Thus, the inventor may have protectable interests that have implications with respect to any copyright interests created. For example, if the inventor has a patent monopoly on the subject matter, then the opportunity to exploit the plans for additional revenue streams is limited at best. An engineer may be interested in copyright of his work product insofar as it is reproduced in marketing materials, instructional manuals and the like. However, with this reality, it is most likely that the client will want to negotiate for the conveyance of any copyright in the work product for these reasons.

Utilitarian objects, or "Useful Articles" may have both copyrightable and non-copyrightable aspects. A "useful article" is an object having an intrinsic utilitarian function that is not merely to portray the appearance of the article or to convey information. Examples are clothing, furniture, machinery, dinnerware, and lighting fixtures. An article that is normally part of a useful article may itself be a useful article, for example, an ornamental wheel cover on a vehicle.

Copyright does not protect the mechanical or utilitarian aspects of such works of craftsmanship. It may, however, protect any pictorial, graphic, or sculptural authorship that can be identified separately from the utilitarian aspects of an

object. Thus, a useful article may have both copyrightable and uncopyrightable features. For example, a carving on the back of a chair or a floral relief design on silver flatware could be protected by copyright, but the design of the chair or flatware itself could not.

## III. Implications of Ownership of the Copyright

Copyright law provides that, in the absence of a written agreement to the contrary, the author is the owner of the copyright in the plans. So, if the contract is silent on the matter, the engineering firm owns the copyright in the plans.

The most common written agreement dealing with this subject matter is the contract between the engineer and client. However, a construction company and engineer may also have a written agreement that transfers ownership in the copyright. Many construction companies desire to purchase rights in plans so they can use them repeatedly in subdivisions without restriction or licensing fees.

Works for Hire

Works for hire include work

- Performed by employees in the scope of employment, or
- Work by independent contractors if it is both specially commissioned and falls within one of the 8 categories listed below:

   a. Contribution to a collective work

   b. Part of motion picture

   c. Translation

   d. Supplementary work

   e. Compilation

   f. Instructional text

   g. Test or answer to test

   h. atlas

In many cases, if not most, plans will not be deemed works for hire when they are done by a sole proprietor engineer. If they are done by an engineer working for an engineering firm, then copyright ownership rests with the employer in

most cases.

## Transfer of Copyright

A written contract may transfer copyright to the client. This should be done with an assignment of copyright interests. State law, including New York, may not reliably transfer the bundle of property rights in other documents and forms. General assignment language must meet the requirements for the law of the state where the contract is to be enforced, or the laws under which it will be determined. These are often set forth in the pro forma language near the end of the contract.

The engineer may negotiate a fee for the transfer of the copyright interests. In fact, since the engineer will be deprived of the opportunity to earn additional revenues from future licensing or sale of the plans, the exclusive services may be at a premium rate in lieu of, or in addition to, a prescribed fee for copyright transfer. These are less legal issues than business issues and thus, your decisions and rates should be considered accordingly. The negotiated fee structure will be market dependent in most cases.

## Modifications to the Plans

Modifications to the original plans are considered derivative works under copyright law and are also protected by copyright. If the engineer owns the copyright, another engineer or architect cannot make modifications without permission of the copyright owner. Once again, you are in the territory of business decisions on what to allow and appropriate fees to negotiate in these circumstances, especially in a small community of engineers who frequently work with one another.

The purchaser of a license has the right to make modifications as a licensee, however, the rights in those derivative works, including the right to make copies, belongs to the original copyright owner.  Yes, that means only one red-line set is allowed; no copying is permitted without a license.

## Term of Copyright

How long does the copyright in the plans and the building last? We will limit our discussion to currently created works. (The terms for past works may differ.) The copyright term depends upon the circumstances, but it is beyond the lifetime of its author!

General Copyright

Generally

Life of author + 70 years

Joint Works

Life of last surviving author + 70 years

Works Made For Hire

Shorter of 95 years from first publication or 120 years from year of creation

(An added benefit is that the term ends on December 31st of the relevant year. We don't need to know exact months and days.)

## Copyright infringement

You will want to consult an attorney who specializes in intellectual property law to discuss your potential remedies and costs. As with anything, prevention is only a fraction of the cost of resolving a dispute.  Some basic information is available on the Copyright Office official website at www.copyright.gov

## Is my copyright good in other countries?

The United States has copyright relations with most countries throughout the world, and as a result of these agreements, we honor each other's citizens' copyrights. However, the United States does not have such copyright relationships with every country.

# IV. Creating and Registering a Copyright

Your work is under copyright protection the moment it is created and fixed in a tangible form that it is perceptible either directly or with the aid of a machine or device. In general, registration is voluntary. (For boat hull design protection under Chapter 13, registration within 2 years is required.) You will have to register, however, if you wish to bring a lawsuit for infringement of a U.S. work. The practice of sending a copy of your own work to yourself is sometimes called a "poor man's copyright." There is no provision in the copyright law regarding any such type of protection, and it is not a substitute for registration.

# Why should I register my work if copyright protection is automatic?

Registration is recommended for a number of reasons. Many choose to register their works because they wish to make a public record and have a certificate of registration. This provides notice to the public of the ownership and copyright claim.  Registered works may be eligible for statutory damages and attorney's fees in successful litigation if registration occurs within 5 years of publication; it is considered *prima facie* evidence in a court of law.  The registration also creates a stronger asset that may be sold or used as collateral in financing.

## Copyright Notice

Copyright rights accrue under common law, even without notice of your intent to claim copyright. So, without doing a thing, you have some weak copyright interests. However, to be able to sue for infringement in federal court, you must register the copyright with the Copyright Office (a part of the Library of Congress). Additionally, one defense that an infringer may use is that he was an innocent infringer, that is, he had no notice that a copyright was claimed in the subject matter. Damages are much different than in the case of willful (knowing) infringement. Thus, it is advisable to mark your plans or drawings with a copyright notice to protect your interests.

Copyright law provides the following notice format for general copyright:

© or

Copr. or Copyright + Year of First Publication + Name of copyright owner

Some people also use more extensive warnings in a legend (in addition to the notice above).

## Formal Registration Process

How long does the registration process take? The time the Copyright Office requires to process an application varies, depending on the amount of material the Office is receiving. If your submission is in order, you may generally expect to receive a certificate of registration within approximately 4 months of submission. Your registration becomes effective on the day that the Copyright Office receives your application, payment, and copy (ies) in acceptable form.

Notes on the Article, "Copyright & Fair Use

Copyright Protection for Short Phrases

a. The judicious choice of words can result in "Incisive Aphorism". The phrase, "Viking Dual Filer/Sander" has a combination of attributes, first, provides a title for an item, secondly, informs the dual purpose uses, "a short statement stating a general truth", of the titled item. Immediately, it became the slogan for first published advertisement promoting the sale of the item which has been widely used for 48 years without written permission of the copyright holder. Air Tool Corp. of America continued to use this phrase and/or parts thereof in ALL of their sales promotions which include, published ads, catalog sheets, brochures and editorials.

b. This phrase is so limited in it's applicable uses, any infringement of the phrase or portions thereof, in relationship with an air sander, clearly violate the copyright of the owner.

"Show Me the Money"

a. This phrase and parts thereof are often used by many of the air tool manufacturers ads, brochures, catalog sheets and labels of inline sanders. i.e., Viking Dual, Dual Piston, Filer/Sander, Dual Filer/Sander and Dual Piston Filer Sander. Example: Allan Air Products, Inc. abandoned the original ATCOA logo in favor of a new embossed logo, in about 1991, using the words and name included in the Copyright phrase; "Dual Piston Filer Sander Viking". Allan Air had NEVER been given written permission to use those words that clearly violate the originality in the Copyright of the owner.

b. This is a phrase distinguished by the conciseness, cleverness

and pointed observation which fulfilled the higher creative standards.

"The Best Offense is a Good Defense"

a. We submit that proof of the Value of this phrase to the work is the massive use of the phrase, words and labels following the introduction of the product in 1963. Virtually ALL of the "Copycat" versions of the original ATCOA Viking Dual Filer/Sander have in some way or another used parts of this phrase in their advertising and tool descriptions. This phrase is not a trivial variation of public domain but an exclusive creation of title, description, use and promotion.

( All of the above are categorically covered in "Copyright Protection for Short Phrases".)



# COPYRIGHT & FAIR USE
### STANFORD UNIVERSITY LIBRARIES

HOME    WHAT'S NEW    FAIRLY USED BLOG    LAW    OVERVIEW    CHARTS & TOOLS    LIBRARIES

Home > Commentary & Analysis > **Copyright Protection for Short Phrases**

## Copyright Protection for Short Phrases

### I May Not Be Totally Perfect But Parts of Me Are Excellent: Copyright Protection for Short Phrases

"There's a great power in words," wrote Josh Billings, "if you don't hitch too many of them together." No doubt about it, a well-turned phrase can have a powerful effect on a reader. A judicious choice of words can result in the perfect punchline, an incisive aphorism, a moral tenet, or, as in the case of a haiku-beauty.



By Richard Stim, J.D.

But short phrases-perhaps because they're so easily severable from larger works-are commonly the subject of theft. They're often plucked and recycled in other literary, musical or artistic works or on merchandise.

Copyright laws disfavor protection for short phrases. Such claims are viewed with suspicion by the Copyright Office, whose circulars state that, "... slogans, and other short phrases or expressions cannot be copyrighted." [1] These rules are premised on two tenets of copyright law. First, copyright will not protect an idea. Phrases conveying an idea are typically expressed in a limited number of ways and, therefore, are not subject to copyright protection. Second, phrases are considered as common idioms of the English language and are therefore free to all. Granting a monopoly would eventually "checkmate the public" [2] and the purpose of a copyright clauseto encourage creativity-would be defeated.

So how many words do you have to string together before you get copyright protection? 10? 20? 100? It's not a matter of numbers. [3] Whether you can stop someone else from using your literary phrases is dependent upon the uniqueness and value of the phrases as well as the way in which you (and the borrower) use them.

Copyright disputes about short phrases end up clustering into three categories:

- one or more phrases are grouped together in order to prove that two works are substantially similar;
- a phrase is appropriated to sell a service or product; or
- an author seeks to protect a singular literary phrase.

This article will examine case law in each of these categories, and also look at the common defenses used by those who appropriate a phrase or group of phrases.

## "You Can't Judge a Book By Its Cover"

Often, in order to prove that a book, article, or other writing has been infringed, an author will point to one or more similar phrases that have been copied in the infringing work. (Infringement requires access and proof of substantial

similarity.) Not all similarities, however, amount to infringement. Separated from the original work, common short phrases are usually unprotectable. For example, if the only thing in common between two works is the phrase, "Hip Hop Behind Bars," [4] or the phrase "safety core" to describe a rope product, [5] that alone is not enough to prove infringement. Similarly, if two legal publishers use similar subject headings, neither will be able to claim infringement on that basis alone. [6] Even if the two works contain dozens or hundreds of similar short phrases, that's not enough to demonstrate substantial similarity if the short phrases are common, public domain or do not "exhibit the minimal creativity required for copyright protection." [7]

For example, in one case, [8] the author of a social history of Jewish migration to San Francisco asserted that factual details, historical events, and some phrases were duplicated in the defendant's novel about a wealthy Jewish family. The defendant admitted consulting the plaintiff's work and taking at least eight descriptive phrases including "hordes of gold seekers," "the river wound its way between muddy banks crawling with alligators," and "rekindle old memories." The court of appeals considered the borrowing of phrases to be insubstantial, noted that facts and historic events are free for all to use, and ruled for the defendant.

In short, sharing similar phrases, particularly common descriptive phrases, is usually not enough, by itself, to win a copyright claim. In order to stop an infringer, the author must either demonstrate that the phrases exhibit sufficient creativity, or that the taking of the phrases, along with other elements such as similar plot or characters, amounts to infringement. [9]

This can get a little tricky for courts, as they must judge the level of creativity-never an easy task-and they must weigh the literal similarities, such as copying of identical phrases, and the non-literal similarities, such as the appropriation of a distinctive plot, characters or style. Add to the confusion that every literary work is a mosaic of these literal and non-literal elements, and that each poached item has a value by itself and a value in relation to the rest of the work. In general, if an author can demonstrate a strong collection of similarities in plot, theme, characters and common phrases (or dialogue), a court will support a claim of infringement. [10]

In some cases, a writer may popularize one or more public domain phrases and then seek to stop others from using them. Usually, such claims are unsuccessful-for example, a songwriter failed to win a claim when the only similarity between two songs was similar public domain phrases, such as "night and noon [11]," or "there will never be another you. [12]"

In another case, a country and western songwriter wrote a song containing the phrase, "I like to gamble, I like to smoke. I like to drink and tell a dirty joke." The defendant's song contained the phrases "She don't drink. She don't smoke. She can't stand a dirty joke." The district court ruled for the borrower and wisely noted that, "the perfect country and western song has been described as including drinking, mother, prisons, trains and trucks. This Court can add to that list without reservation smoking, gambling, loving, and telling dirty jokes." [13]

There are situations in which one writer can stop another from copying public domain phrases, but these usually involve some creativity in the choice, sequencing or ordering of the phrases-for example, the author of a unique collection of civil war phrases could prevent another publisher from lifting large segments for a competing work. As one court put it, "[T]hough ordinary' phrases may be quoted without fear of infringement, a copier may not quote or paraphrase the sequence of creative expression that includes such phrases." [14]

## "Show Me the Money"

In cases where short phrases are used to sell things, court decisions appear to follow two general rules:

(a) a court is likely to find that common short phrases used in advertising or label copy-for example, "FDS is the most personal sort of deodorant" are, by themselves, usually not protectible [15] and

(b) if a popular phrase is hijacked for a blatant commercial use-for example, using "E.T., Phone Home" on drinking mugs [16]-courts are more likely to find infringement.

There are many exceptions to these rules. In the case of advertising or label copy, for example, when more than the advertising phrases are borrowed, for example, layout or visual imagery, then a court may be much more likely to protect one advertiser from infringement by another. [17] Similarly, even humdrum phrases such as, "Why are we giving away SOLEX Electric Toothbrush Sets for Only $3?" and, "This is NOT a misprint" may be protected against copying when they are selected and arranged to mimic a competitor's advertisement. [18]

In cases involving the use of phrases in connection with the sale of merchandise, courts are often strongly swayed by the connection of the phrase with a fictional character or real person. In the case involving "E.T. Phone Home" drinking mugs, the judge said, "[T]he use of the name . . . conjures up the image and appeal of the E.T. character names protected under copyright." A similar result occurred in a case involving, "Look! . . . Up in the sky! . . . It's a bird! . . . It's a plane . . . It's Superman!" when that phrase was used as part of a campaign to sell consumer electronics equipment. [19] Most likely, other famous movie phrases [20] would enjoy similar protection, particularly if a character association was also made. In a case involving the sale of busts of Martin Luther King, Jr. advertisements contained a few short phrases from one of his speeches. Perhaps swayed by the blatant commercial exploitation of Dr. King's words, a court ruled that the borrowing was an infringement. [21]

In these sales-oriented cases, copyright is sometimes stretched to do the work of trademark law. In the world of trademarks, short phrases *are* protected if consumers associate them with particular goods or services. In some of the cases described above, the phrases were used for their associative or "endorsement" power and, under those conditions, courts may accept less significant similarities to justify a finding of copyright infringement.

## "Euclid Alone Has Looked on Beauty Bare"

In the examples above, the cases analyzed situations where a phrase is derived from a larger work. But what if the phrase is the whole work? Will copyright ever protect it? The possibility was explored most famously by Judge Frank in *Heim v. Universal Pictures Co., Inc.* [22] In *Heim*, the issue arose as to whether the copyright of a musical phrase would be enough to justify a finding of infringement. Judge Frank determined that lack of originality, not brevity, is what prevents the separate copyrightability of a phrase. This originality could be demonstrated by a phrase that was so idiosyncratic that its appearance in another work would preclude coincidence and, as an example, Judge Frank cited Edna St. Vincent Millay's title and opening line to her sonnet, "Euclid alone has looked on beauty bare." Or, as copyright scholar Melville Nimmer summed up the standard, "The smaller the effort (e.g., two words) the greater must be the degree of creativity in order to claim copyright protection." [23]

Obviously, terse statements such as, "Contents Require Immediate Attention" or, "Gift Check Enclosed" do not exhibit sufficient originality. [24] But do statements of advertising copy, haikus, or jokes, all of which rely on brevity and simplicity, rise to the necessary level of originality?

One example of the higher degree of creativity necessary for copyright protection is evidenced by Ashleigh Brilliant, the author of literary phrases sold on postcards and merchandise. (For examples of Brilliant's "Pot-Shots," see www.ashleighbrilliant.com.)

In a 1979 case, [25] a company copied two of Brilliant's phrases-"I may not be totally perfect, but parts of me are excellent" and "I have abandoned my search for truth and am now looking for a good fantasy"-and altered a third phrase, all for sale on t-shirt transfers.

The district court acknowledged that the phrases were distinguished by conciseness, cleverness, and a pointed observation, and ruled that they were protected by copyright. By fulfilling the higher creative standards of an epigram,

Brilliant's Pot-Shots also satisfied the inverse relationship between originality and length discussed by Judge Frank and Professor Nimmer.

In *Brilliant*, the clever arrangement of a small group of words established the required degree of originality. However, arrangement of words is not the only means of demonstrating originality in a short phrase. Evidence of creativity also is demonstrated by the use of inventive words or language.

For example, in *Heim*, Judge Frank also mentioned a phrase from Jabberwocky-"Twas brillig and the slithy toves"-as an example of sufficient originality. [26] A similar style of nonsense "code words" prompted Judge Learned Hand to write, "Conceivably there may arise a poet who strings together words without rational sequence-perhaps even coined syllables-through whose beauty, cadence, meter and rhyme he may seek to make poetry." [27]

## "The Best Offense is a Good Defense"

An author accused of borrowing one or more phrases from another work will usually make one (or all) of the following arguments in defense:

- copyright doesn't protect the copied phrases,
- even if the phrases are copyrighted, the borrowing is too small (or de minimis) to matter,
- even if the phrases are copyrighted, the two works are not substantially similar, or
- even if the phrases are copyrighted, the borrowing is excused by the fair use or parody defense.

The first three defenses have already been discussed, above. Fair use and parody are covered in considerable detail elsewhere on this Stanford Copyright and Fair Use website. However, it's worth adding an additional comment or two.

In analyzing the fair use defense when short phrases are borrowed, a court will aggregate the phrases and weigh the value of the phrases in relation to the work. Or, put another way, are the phrases the heart of the work? The more important the phrases are to the work, the harder it often is to win a fair use battle.

The parody defense, although considered a branch of the fair use doctrine, has acquired its own factors and characteristics. By its nature, parody demands some borrowing from an original work in order to "conjure up" the original. In one case, [28] the composers of the song "When Sunny Gets Blue" claimed that their song was infringed by "When Sonny Sniffs Glue," a twenty-nine second parody which altered the original lyric line and borrowed six bars of the plaintiff's music. The court permitted the parody and noted that: "[T]he economic effect of a parody with which we are concerned is not its potential to destroy or diminish the market for the original-any bad review can have that effect-but rather whether it *fulfills the demand* for the original. Biting criticism suppresses demand; copyright infringement usurps it."

Claiming fair use or parody as a defense has an unfortunate hitch. The only way to find out if you're right is to have a court rule on the matter. From a real-world perspective, this often favors the litigant with the deepest pockets-that is the party who can last the longest in litigation. However, there are some cases where a borrower has a very strong argument that fair use will apply-for example, borrowing a few lyric lines of a song in a review or new article. But when the use of short phrases lacks some transformative value or fails to offer some insight or commentary-for example, copying phrases on a T-shirt-the fair use argument is harder to win.

## Conclusion

Judge Frank's observation in *Heim v. Universal Pictures* remains the most insightful guideline for the protection of short phrases-a literary phrase must be so idiosyncratic that its appearance in another work would preclude coincidence. What produces this idiosyncrasy? In parody, it is the interposition of something familiar with something incongruous. In a character phrase, such as "E.T. Phone Home," it is the inseparable association between the words and the fictional personality. In an epigram, it is the demonstration of a highly structured creativity.

In order to guess how protectible a phrase may be, the question must be asked-as in the protection of characters-has enough development gone into the work so that a line can be drawn separating the author's expression from that which is in the public domain? Wherever this line is drawn, it will seem arbitrary, but "that is no excuse for not drawing it . . " [29]If an author has created a uniquely suggestive phrase, then the courts will protect it under copyright. But if an author's literary phrase is merely a trivial variation on that which already belongs to the public, copyright will not extend.

---

[1] Though the Copyright Office circulars do not have the force of a statute, they are considered to be, "a fair summary of the law." *Kitchens of Sara Lee, Inc. v. Nifty Foods Corp.,* 266 F. 2d 541 (2d Cir. 1959); *Ets-Hokin v. Skyy Spirits, Inc.,* 225 F.3d 1068 (9[th]Cir. 2003).

[2] *Morrissey v. Proctor & Gamble Co.* 379 F. 2d 675 (1st Cir. 1967).

[3] That said, one court apparently felt that 54 words *was* enough. A 54-word "thank you" passage from a car dealership brochure was considered copyrightable and a competitor's use of a similar thank you passage was an infringement.*CRA Mktg., Inc. v. Brandow's Fairway Chrysler-Plymouth-Jeep-Eagle, Inc.,* 1999 U.S. Dist. LEXIS 11889 (E.D. Pa. 1999).

[4] *Bell v. Blaze Magazine,* 58 U.S.P.Q. 2d (BNA) 1464 (S.D. N.Y. 2001).

[5] *J. Racenstein & Co. v. Wallace,* 1999 U.S. Dist. LEXIS 12675 (S.D. N.Y. 1999).

[6] *State of Georgia v. Harrison Co.,* 548 F. Supp. 110 (N.D. Ga 1982).

[7] *Arica Inst., Inc. v. Palmer,* 970 F.2d 1067, 1072 (2d Cir. 1992).

[8] *Narrell v. Freeman,* 872 F.2d 907 (9th Cir. 1989).

[9] For all rules there are exceptions (or aberrations). In a 2000 case, the author of a book, "Wall Street Money Machine," claimed that motivational speaker Anthony Robbins used a few of his phrases in a "Financial Power" manual, given out at a Robbins seminar. (The phrases were based on metaphors comparing investing to driving a taxi.) The jury determined that Cook had a valid copyright and that there was infringement on two of the four copied phrases: "Money is made on the Meter Drop" and "No one I know has come up with a name for the type of investing I call `Rolling Stocks.' It works on stock that roll up and down in repeated waves. . . . Some roll fast and some slow." The Ninth Circuit upheld the damage award against Robbins for $655,000 but the case subsequently settled and the decision was withdrawn by the court. *Cook v. Robbins,* 232 F.3d 736 (9th Cir. 2001).

[10] *Shaw v. Lindheim,* 919 F.2d 1353, 1361 (9th Cir. 1990).

[11] *O'Brien v. Chappel& Co.,* 159 F. Supp. 58 (S.D. NY 1958)

[12] *Gingg v. Twentieth Century Fox Film Corp.,* 56 F. Supp. 701 (S.D. Cal. 1944)

[13] *Pendleton v. Acuff-Rose Publications, Inc.,* 225 U.S.P.Q. (BNA) 935 (M.D. Tenn. 1984).

[14] *Salinger v. Random House, Inc.,* 811 F.2d 90, 98 (2d Cir. 1986).

[15] *Alberto-Culver Co. v. Andrea Dumon, Inc.,* 466 F.2d 705, 710 (7[th]Cir., 1972).

[16] *Universal City Studios v. Kamar Industries, Inc.,* 217 U.S.P.Q. (BNA) 1165 (S.D. Tex 1982).

[17] *Klitzner Industries, Inc. v. H. K. James & Co.,* 535 F. Supp. 1249 (E.D. P.A., 1982).

[18] *Raffoler, Ltd. v. Peabody & Wright, Ltd.*, 671 F. Supp. 947 (E.D. N.Y. 1987).

[19] *DC Comics, Inc. v. Crazy Eddie, Inc.*, 205 U.S.P.Q. (BNA) 1177 (S.D. N.Y. 1979).

[20] Professor J. Wesley Cochran of Texas Tech had his copyright class submit suggestions for protectible phrases from movies and they came up with:

She's my sister. My daughter. My sister. My daughter. She's my sister

and my daughter.

Badges? We don't need no stinking badges!

Here's looking at you, kid.

Frankly, my dear, I don't give a damn.

Bond. James Bond.

You know how to whistle, don't you Steve? You just put your lips together

and blow.

Go ahead. Make my day.

Why don't you come up and see me sometime?

I'll make him an offer he can't refuse.

Toto, I don't think we're in Kansas anymore.

You talking to me?

http://legalminds.lp.findlaw.com/list/cni-copyright/msg12983.html

[21] *Martin Luther King Jr. Center for Social Chance. v. American Heritage Products, Inc.*, 508 F. Supp. 854 (N.D. Ga 1981).

[22] *Heim*, 154 F.2d 480 (2d Cir. 1946).

[23] 1 M. Nimmer, NIMMER ON COPYRIGHT 2.01[B] (1988).

[24] *Magic Marketing, Inc. v. Mailing Services of Pittsburgh, Inc.*, 634 F. Supp. 769 (W.D. Pa. 1986).

[25] *Brilliant v. W.B. Productions, Inc.* Civ. No. 79-1893-WMB (S.D. Cal Oct. 22, 1979).

[26] A British court reached a similar conclusion in *Exxon Corp. v. Exxon Ins. Consulting int'l Ltd.* [1981] 2 All E.R. 495, 504. FYI, In case you're wondering, the word "Supercalifragilisticexpialidocious," was not an invented term when used in the song of the same name. *Life Music, Inc. v. Wonderland Music, Co,* 241 F. Supp. 653 (S.D. NY 1965).

[27] *Reiss v. National Quotation Bureau, Inc.*, 276 F. 717 (S.D. NY 1921)

[28] *Fisher v. Dees*, 794, F.2d 432 (9th Cir. 1986).

[29] *Nichols v. Universal Pictures Corp.* 45 F.2d 119, 122 (2d Cir.) (Decision by J. Learned Hand)

This site is sponsored by Stanford University Libraries and Academic Information Resources, Justia, NOLO, LibraryLaw.com & Onecle

   

      ©2005-2009 The Board of Trustees of the Leland Stanford Junior University. With the exception of the Nolo Copyright and Fair Use Overview, this work is l
under a Creative Commons Attribution-Noncommercial 3.0 United States License.

Stanford Copyright Reminder | DMCA Agent | The Center for Internet and Society Fair Use Project | contact

# From Original 1963 ATCOA Blu



Birth Certificate, Copyrighted
By Karl Selander
"Christened Viking Dual" 1963

Initialed
Otto Hendrickson
and Karl Selander

Exhibit "K" from Plaintiff's
complaint!
copy of section of the
original Blueprint with
initials of Roy Brodsky,
Karl Selander and Otto
Hendrickson, Inventor.
Also, first two nation
magazine advertisements.

# YOU ASKED FOR IT!

## A Combination Air-Powered Filer/Sander To Slash Time and Improve Quality!

### Two Great Tools in One!
### The Revolutionary, New
# VIKING DUAL
### Filer/sander

**(Changes from filing to sanding in seconds)**



*ATCOA's first national ad.*
*1963*
*At this point, ATCOA did*
*not have their own address.*
*The address displayed was*
*That of Kaye & Miller Machine*
*Co. in Culver City, CA*

THE ONLY FILER/SANDER WITH 13/16" STRAIGHT STROKE

The VIKING DUAL air tool AUTOMATES HAND FILING AND SANDING and makes them obsolete forever! Works any metal or wood surface in a fraction of the time . . . works plastic filler at any stage of hardness!

The VIKING DUAL filer/sander will pay for itself in a very short time by turning out quality work much faster than ever before, enabling you to accept more jobs.

Find out why the VIKING DUAL has become the hottest aid in the auto body business. Mark the reader service card in this magazine or write to the address below for further information or demonstration. But do it today!

The VIKING DUAL filer/sander has nearly a full inch stroke in a straight line motion . . . handles 3 times the work area of conventional tools . . . eliminates swirl marks . . . rugged enough for power filing, gentle enough for feathering.



# AIR TOOL CORPORATION OF AMERICA
**9456 W. Jefferson Boulevard • Culver City, California • Phone 870-0338**

## AS SEEN IN AUTOMOTIVE SERVICE & BODY NEWS

# viking DUAL air-tool



**ATCOA**
AIR TOOL CORP. OF AMERICA

## Sanding

THE ONLY FILER SANDER! AND A 13/16" STRAIGHT STROKE TOO!

## Filing

# FIRST "combination" sanding and filing tool...
# FIRST successful tool to mechanize hand filing.

The VIKING DUAL is a revolutionary new air-driven reciprocal-stroking hand **machine** which serves as both a filer and sander. Remarkably light in weight and easy to use, it **entirely eliminates** old-fashioned hand filing methods. At the same time, it provides incredible improvements in body shop sanding operations.

**CONSUMER PRICE**

## $175.00

Including 2-1/2" Sanding Shoe
OPTIONAL with 4" SHOE $179.50
SOLD SEPARATELY
4" Sanding Shoe $10.50 ea.
2½" Sanding Shoe $5.95 ea.
All shipments F.O.B. Calif. Factory.
Freight Prepaid on 6 Tools or More.

**The Ideal Tool for the Following Industries:**

AUTOMOTIVE
PLASTICS
WOODWORKING
FOUNDRIES
FURNITURE MANUFACTURING
SHIP & BOAT BUILDING
BLENDING OF STAINLESS STEEL
AIRCRAFT
APPLIANCE REFINISHING
TRAILERS
ORDNANCE BUILDING
CONTRACTORS

VIKING DUAL turns out premium quality work speedier than ever before, whether it be on metal, plastic or wood, enabling reduction of time spent per job up to 70%!

VIKING DUAL has built-in brain as well as brawn. Patented internal air-cushioned piston motion counteracts tooling motion . . . without need of counterweights. Up to 3,000 super-size 13/16" reciprocating strokes per minute take deep, almost effortless "bites" out of any job it is set to performing. Action is unbelieveably smooth. Balance superb. Result is extraordinary! Uniform, rapid output greatly reduces buck and bounce, vibration and operator fatigue. Universal reaction to all using the VIKING DUAL AIR TOOL is "How did we ever get along without it!" Users report up to 70% improvement in profits and labor costs! Optional with 4" Shoe $179.55

Fits standard Vixen blades. Converts from Sanding to Filing and vice versa in 30 Seconds.



# AIR TOOL CORPORATION OF AMERICA
1147 South Robertson Boulevard · Los Angeles 35, California

# viking DUAL air-tool

## PRODUCT OF  AIR TOOL CORPORATION OF AMERICA

### SPECIFICATIONS

- Weighs under 7 lbs.

- Base abrasive area covered — over 40 square inches

- Standard Abrasive Sheets—2¾″ x 17½″

- 13/16″ reciprocating straight line strokes

- Up to 3,000 strokes per minute

- 90 lb. sanding air pressure; 120 lb. filing air pressure "on unrestricted line"

- Utilizes standard size Vixen file and sanding attachments

- Air consumption — approx. 7 cubic feet per minute

- Built-in oil wick reservoir

- Only seven moving parts

- 90 Day Warranty against all defects in material or workmanship



Karl Selander at his body shop working with a Viking Filer/Sander.

# Important facts about the VIKING DUAL AIR-TOOL

**1** Performs on plastic fillers at any stage of hardening. No waiting. Abraiding operations can be more closely scheduled.

**2** Handles feather edging with remarkable ease and smoothness. Unmatched for coverage and maneuverability.

**3** Depth and speed of reciprocal stroking radically reduces metal shrinkage, improving and speeding work.

**4** No swirling or surface etching as with orbital sanding tools.

**5** Abrasives last longer. Reciprocal action reduces frequency of file sharpening. Sandpaper loads up less and lasts longer.

**6** No problem of shorting out as with electrical tools.

**7** Minimizes use of power grinding equipment, after paint is removed.

**8** Greatly reduced fatigue factor resulting from patented power thrust. The harder the job, the harder the tool works.

**9** Improved quality of work output and faster speed enables unit to pay for itself many times over in first few months.

**10** Close tolerance, simple construction, only seven moving parts, give unit long-lasting ruggedness and stamina. Extremely low maintenance.

# A Combination Air-Powered Filer/Sander To Slash Time and Improve Quality!



One of the first ATCOA Viking Sanders showing the first ATCOA logo design.

KARL W. SELANDER

VICE PRESIDENT
PRODUCTION AND DEVELOPMENT    1147 SOUTH ROBERTSON BLVD.
AIR TOOL CORP. OF AMERICA         LOS ANGELES, CALIFORNIA

**ATCOA**
AIR TOOL CORP. OF AMERICA
1147 SOUTH ROBERTSON BLVD.
LOS ANGELES, CALIF.  90035

Karl Selander's first business card with Air Tool Corp. of America
as an unpaid Vice President of Production and Development.
Also, service and repair manual authored by Karl Selander for the
ATCOA Viking Dual Air Tool.  Date: 1964



# service manual

## viking dual
## air tool

# Service Instructions

The Viking Dual Air Tool is a horizontal, reciprocating air sander filer with a 13/16" stroke at its normal operating speed of approximately 3,000 strokes per minute. For proper operation it requires a minimum air pressure of 90 pounds per square inch for sanding and 120 pounds per square inch for filing, however, ressure up to 180 pounds per square inch will not harm the tool. At these ressures the machine will consume from 7 to 9 cubic feet of air pressure per minute. It is imperative that an adequate supply of air be available to obtain satisfactory performance.

While the Viking Dual Air Tool has far fewer moving parts than do conventional air tools, it is, as are all air tools, a precision machine. Because of this, the tools must be handled and serviced as such. Careless handling of the tool can cause serious damage, especially if the tool is operated after it is damaged. Because the Viking Dual has moving parts it requires lubrication. Type "A" transmission oil is not only recommended . . . IT IS SPECIFIED ! ! ! ! Failure of the owner to properly oil the tool, with the specified lubricant, or careless and improper handling will cause the manufacturer's warranty to be voided. Repairs done to the Viking Dual Air Tool, for repair damage caused by improper handling or failure to lubricate, will be done only at the owner's expense.

Because the Viking Dual is used as a filing and sanding tool, the normal conditions under which it is used would be considered excessively dusty for other air tools. In spite of this, the tools will render outstanding performance, with exceptional reliability, with a minimum amount of care. Under normal conditions, the oil reservoir on the side of the tool should be filled twice daily with Type "A" Transmission oil. Care should be exercised when filling the reservoir, not To

introduce sanding grit, or other foreign matter. The tools should be wiped clean of all dust, sanding grit, and file particles prior to removing the oil reservoir plug. When the oil reservoir is filled, several drops of Type "A" transmission oil should be squirted into the air inlet at the rear of the tool. For continuous operation, a fog-type oiler should be installed in the system, with a setting such that it administers 3 to 5 drops of oil per hour into the air supply. A maximum of 50 feet of 5/16 I.D. hose is recommended, because longer lengths restrict the air supply, cause low pressure conditions at the tools, and interfere with proper oiling when fog-type oilers are used. Type "A" transmission oil must be used when fog-type oilers are employed in the system.

An adequate filtering system should be used in the air supply system to remove water and other contaminants, and prevent them from entering the tool. The presence of water will cause rust and pitting of the machined surfaces, and thus will enduce excessive wear. If tool is to be stored away for a period of time, squirt oil in air intake and run for a few seconds.

Under no circumstances should the Viking Dual be disassembled by anyone other than a factory-trained service man. The proper timing of this tool is extremely critical, and if it is not done correctly an attempt to operate the tool may result in its destruction, and possible injury to the operator. Any attempt to repair or dismantle the tool will void completely the warranty, and release the manufacturer from any warranty or responsibility.

This tool was two years in testing and engineering to reach the point of perfection we have achieved to date. With proper care, this tool should offer many years of excellent, satisfactory service.

## IN SERVICING THIS TOOL, CHECK THESE IMPORTANT POINTS FIRST:

1. PLACE A STEEL RULE ON THE BOTTOM OF THE CARRIER TO BE SURE THE CARRIER IS ABSOLUTELY STRAIGHT. IF NOT, THE TOOL WILL NOT OPERATE PROPERLY.

2. CHECK FOR PROPER ADEQUATE OILING, AS TOOL REQUIRES BEING OILED DAILY WITH THREE OR FOUR DROPS OF Type "A" TRANSMISSION OIL FOR MAXIMUM PERFORMANCE.

3. IF IN CHECKING THIS TOOL IT HAS NOT BEEN ADEQUATELY OR PROPERLY OILED, OR IF THE CARRIER IS BENT, THIS WOULD INDICATE MISHANDLING OF THE TOOL AND WOULD VOID ANY GUARANTEE ON THE PART OF ATCOA, CONSEQUENTLY A CHARGE WOULD APPLY FOR THE REPAIR CAUSED BY THE TWO ABOVE.

NOTE: Prior to service, check tool as far as possible for the following:

### TROUBLE ITEMS

A. If the tools operate properly in the repair shop, the owner's air supply may lack pressure or volume.

B. Bent Carrier          C. Water in Tool          D. Lack of Oil

E. Insufficient or Restricted Air Supply
(Sanding—90 PSI, Filing—120 PSI, Minimum)

F. Frozen Steel Ball in Rear Head

G. Worn Carrier Assembly on Side Straps

H. Scarred Pistons and Cylinder

I. Damaged Pistons, Rings or Leather Cup on I-D Model

# Inspection

Thoroughly inspect all parts for excessive wear. Replace as required. Inspect cylinder bore for scratches, being especially careful if pinion gears are badly worn or damaged. If gears are worn be sure to replace bearings also as the particles from the cyanide case will be in the bearings. Check cylinder bore for wear and out of round with go-no-go gauge or micrometer. If the cylinder bore is more than .005 inches out of round, or if the bore exceeds 1.185 inches, the housing should be returned to the factory to be rebored. If there are excessively deep scratches on the cylinder walls, which cannot be removed by honing, without exceeding the above limits, the housing should be returned for reboring. If the go-no-go gauge is used, the housing should be returned if the no-go end can be inserted at any point. If the cylinder is a standard .010 inches oversize, and

is scratched, or the out-of-round exceeds .005 inches, or if the diameter of the bore exceeds 1.196, the housing must be replaced. If the housing must be replaced or rebored, the pistons must also be replaced. The tools should be carefully inspected for internal rust conditions, as this will indicate that water has been introduced into the tool, and will void the warranty. Inspect the carrier for bend. The maximum allowable bend is .003 inches. This can be checked with a straight edge and a set of feeler gauges. If the bend exceeds the above limits or if there is broken chrome on the carrier assembly, it must be replaced. Generally speaking, a bent carrier indicates that the tool has been dropped or abused and this voids the warranty issued. If the valve seat is damaged, return the tool to the factory for replacement. DO NOT ATTEMPT TO REMOVE ! ! ! !

# Disassembly



1. Clean machine thoroughly to remove all sanding grits and other foreign materials.
2. Remove front knob by screwing counter-clockwise.
3. Remove 6 screws holding rear handle assembly and remove handle assembly.
4. Remove valve pin under handle.
5. Remove steel valve retaining screw on top of housing, invert housing and tap lightly to allow valve to fall out.
6. Remove 4 socket screws from front head and remove front head, discarding gasket.
7. Remove 4 socket screws from rear head and remove rear head, discarding gasket.
8. Remove 12 screws holding side strap. With tool inverted, remove side straps.
9. Lift carrier assembly from machine.
10. Remove actuator gear in center of machine.



11. Use finger to punch both pistons in as far as possible. Place sharp end of bearing removal tool between bearing and pinion gear and tap down gently with a hammer forcing bearing partially out of the housing. Reverse tool, and with protruding portion against bearing, pry against pinion to remove bearing. Hold machine on its side and tap gently against hand to remove pinion shaft. Invert tool and remove pinion gear and two steel spacers. Drive out opposite bearing with drift punch of same size as the pinion shaft. Be sure the end of the punch is flat. Repeat operation to remove remaining pinion, shaft, spacers, and bearings.
11a. If bearing appear to be badly worn or cannot be readily removed, use a 13/16" drill to drill a hole in one bearing cap. With a small drift, punch the pinion shaft and opposite bearing may be forced out.
12. Remove both pistons from machine, pressing lightly on piston rings if piston does not slide freely.
13. Remove 8 Counter-sunk screws in bronze aluminum wear strips, and remove wear strips if required.
14. To remove valve spring and ball, invert rear head in vise and remove brass fitting and spring. Turn head right side up and over hand and allow ball to drop out. Be sure to avoid damaging the face of head.

# THE ONLY SPECIAL TOOLS REQUIRED FOR SERVICING THE VIKING DUAL AIR FILE AND SANDING MACHINE



TIMING GUAGE



TORRINGTON BEARING REMOVAL TOOL



## OTHER TOOLS REQUIRED

● 1–REGULAR SCREW-DRIVER

● 1–¼" ALLEN HEAD WRENCH

● 1–PHILLIPS HEAD SCREW-DRIVER

● 1–6" CRESCENT WRENCH

● 1–GO-NO-GO GAUGE OR MICROMETER

● 1⅛" ALLEN HEAD WRENCH

## TIME SCHEDULE

| OPERATION | TIME IN MINUTES |
|---|---|
| #1 | 5.00 |
| #2 | 0.25 |
| #3 | 1.50 |
| #4 | 0.25 |
| #5 | 0.75 |
| #6 | 1.75 |
| #7 | 1.75 |
| #8 | 2.00 |
| #9 | 0.25 |
| #10 | 0.25 |
| #11 | 3.75 |
| #12 | 0.25 |
| #13 | 1.50 |
| #14 | 2.00 |
| #15 | 2.00 |
| #16 | 2.30 |
| #17 | 1.00 |
| #18 | 0.50 |
| #19 | 0.30 |
| #20 | 2.25 |
| #21 | 1.25 |
| #22 | 0.30 |
| #23 | 3.75 |
| #24 | 0.75 |
| #25 | 1.00 |



# Reassembly

15. Reverse Operation #14.

16. Replace pistons, being careful to place rack towards bottom of the machine, and push in as far as possible.

17. Replace bronze-aluminum wear strips.

18. Grease bearing cups with Texaco Marfax #2 cup grease or equivalent.

19. With an arbor press or brass hammer, replace bearings on one side of the machine only.

20. Place some petroleum jelly or light grease on each side of pinion gear, place steel spacer in position and set pinion gear in place. Slide pinion shaft through pinion gear and install opposite bearing. Repeat to install remaining pinion gear.

21. Invert the housing on the bench with the thick section around the valve facing away from you. Insert the actuator gear with the timing mark in the twelve o'clock position. Using the timing gauge to position both pistons. If a gauge is not available, the piston should be positioned 0.400 inches from the face of the housing. The pinion gear should then be moved slightly to bring the closest tooth on the pinion gear to a vertical position.

22. Replace the carrier assembly with the timing mark aligned with the timing mark on the actuator gear. Be certain that the racks on the carrier assembly engage the pinion gears.

23. Place machine on its side, place a light coat of Permatex on each side strap, and replace one side strap. Be extremely careful that the timing does not change while performing these operations, since an attempt to operate an improperly timed machine will cause severe damage to the machine, as well as possible injury to the operator. Allow a clearance of .003 to .005 inches between the carrier assembly and the bottom lip of the side straps. If the clearance is excessive, the machine will give sloppy operation with excessive wear. If the clearance is insufficient, the straps will overheat, and may freeze to carrier, stalling machine. There is a slight amount of adjustment in the side straps.

24. Place machine right side up on bench, and drop valve into place. The protruding section of the valve must drop into the slot formed by the actuator gear shaft. This may be checked by operating the carrier assembly by hand and noting if the valve rotates.

25. Reverse operations 7 through 2, using new gaskets when replacing front and rear heads. When machine is completely assembled, refill the oil reservoir on the side of the machine and before operating, place several drops of oil in the inlet air fitting. Type "A" transmission oil must be used.

NOTE: The roll pin holding the trigger in the rear handle should be replaced whenever the tool is serviced. Check valve pin and valve pin seat or bottom of trigger. It is not necessary to disassemble the tool to remove and replace the roll pin.



# Parts and Parts Price Breakdown

### ASSEMBLIES

A. Body: Including Nos. 1 and 2 ......... 59.50

B. Rear Head: Including
   Nos. 3, 4, 5, 6, 7, 8, 9 .............. 19.15

C. Handle: Including Nos. 10 and 11 ..... 8.95

D. Pinion Gear, Shaft and Bearing:
   Including Nos. 17, 18, 19, 20 ......... 16.65

E. Complete Piston Set: Including*
   Nos. 21, 22, 23, 24 ................. 18.85

F. Carrier: Including
   Nos. 25, 26L, 26R, 27, 28 ........... 27.95

G. Sanding Shoe 2½" width ............. 5.95

H. Sanding Shoe (not shown)
   4" width ............................ 10.50

*2 of each Nos. 21 and 22
  4 of each Nos. 23 and 24

### INDIVIDUAL PARTS

1. Bearing Strips (4) .................... 9.65
2. Bearing Strips Screws ................ .05
3. Rear Head ........................... 17.90
4. Pin, Air Valve ....................... .20
5. Plug, Valve Pin Sleeve ............... .20
6. Brass Adapter ....................... .30
7. Steel Ball (air intake) .............. .30
8. Spring (air intake) .................. .05
9. Plug, Spring Retainer ................ .20
10. Trigger ............................. 2.00
11. Pin, Trigger ........................ .05
12. Front Head ......................... 3.50
13. Head Gasket Set ..................... .35
14. Head Screws (Short) ............ea. .10
15. Head Screws (Long) ................. .15
16. Front Knob ......................... 3.45
17. Bearing Shaft ....................... 1.55
18. Bearing Spacers (4) ................. .10
19. Pinion Gear ........................ 5.60
20. Bearing, Pinion ..................... .55

21. Piston .............................. 4.10
22. Piston Gear Rack .................... 2.95
23. Teflon Ring (Piston) ................ .45
24. Felt Plug (4) ....................... .10
25. Carrier ............................ 25.05
26L. Carrier Rack Gear .................. 2.95
26R. Carrier Rack Gear .................. 2.95
27. Actuator Rack Gear .................. 4.50
28. Actuator Wear Plate ................. 1.50
29. Side Straps (Set) .................. 11.60
30. Side Strap Screw ...............ea. .05
31. Actuator Gear ....................... 4.95
32. Valve ............................... 6.25
33. Valve Plug "O" Ring ................. .10
34. Valve Plug .......................... .85
35. Handle Front Screws ...........ea. .05
36. Handle Rear Screws ............ea. .05
37. File Nut & Bolt Set† ................ .35
38. Aluminum Rivets† ..............ea. .05
                 †Not Shown



*So Robertson Bl. Los Angeles*

# AIR TOOL CORPORATION OF AMERICA

+You  Search  Images  Videos  Maps  News  Shopping  Gmail  More                     Sign in

Gogle books    RodacViking Sanders                        Submit Qu   Advanced

## Books

🔍  🔍  📄  📑  ▦  ⛶    ✂  ∞    Add to my library ▼        Write review

Page 1030 ▼  ❮  ❯    ⚙  ▾

Result **2** of **2** in this book for **RodacViking Sanders**
- ‹ Previous  Next › -  View all

EBOOK - FREE

Get this book in print ▼

    0

0 Reviews
Write review

**Catalog of Copyright Entries.**
**Third Series: 1974: January-**
**June: Index**
By Library of Congress. Copyright Office

RodacViking Sanders      Go

About this book

My library

My History

eBookstore

Terms of Service

Clip      Link      Feedback

Copyrighted "Manual for ATCOA and Rodac "VIKING" type
straightline sanders" issued to a Robert Black in 1974, #A529754.







The last embossed Logo used by Allan Air Products, Inc. which infringes on the Selander Copyrighted Phrase. "Viking Dual Filer/Sander" created on the original Blueprint.







$7.40
MAR 28 2012
7 oz First-Class F

endicia.com

USPS FIRST-

Karl Selander
15531 Branchcrest Cir.
Dallas, TX 75248

7011 0470 0003 4170 0997

RECEIVED

MAR 2 9 2012

8

**UNITED STATES DISTRICT COURT**
OFFICE OF THE CLERK
NORTHERN DISTRICT OF TEXAS
1100 COMMERCE - ROOM 1452
DALLAS, TX 75242-1495